596 F.Supp. 1333 (1984)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; and Lieutenant Otto J. Binker, Plaintiffs,
v.
COMMONWEALTH OF PENNSYLVANIA; Pennsylvania State Police; and Daniel F. Dunn, Commissioner of the Pennsylvania State Police, Defendants.
Civ. A. No. 83-0321.
United States District Court, M.D. Pennsylvania.
October 24, 1984.
*1334 *1335 Robert P. Casey, Dilworth, Paxson, Kalish & Kauffman, Scranton, Pa., John L. Heaton, Dilworth, Paxson, Kalish & Kauffman, Harrisburg, Pa., for plaintiffs.
Reginald L. Sydnor, Susan DeLarm, Philadelphia, Pa., and Barbara L. Kosik, Asst. U.S. Atty., Harrisburg, Pa., for plaintiff E.E.O.C.
Francis X. O'Brien, Jr., Pa. State Police, Joseph S. Rengert, Pa. State Police, Harrisburg, Pa., for defendants.

MEMORANDUM
HERMAN, District Judge.

I. INTRODUCTION
Pennsylvania law currently provides that any member of the Pennsylvania State Police, regardless of rank, who reaches the age of sixty, must resign from the force,[1] unless at that age he has attained less than twenty years of service. 71 P.S. § 65(d) (Purdon's Supp.1984-85). The Equal Employment Opportunity Commission (EEOC) and various State Police officers have attacked the validity of this law as a violation of the federal Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621-634.[2] The Commonwealth has countered that the mandatory retirement age is a bona fide occupation qualification reasonably necessary to the operation of the Pennsylvania State Police. 29 U.S.C. § 623(f)(1).
On March 11, 1983, we granted a temporary restraining order enjoining the State Police from mandatorily retiring individuals who reached the age of sixty. On June 23, 1983, following eight days of testimony, we granted a preliminary injunction in favor of Plaintiffs and continued to enjoin enforcement of the mandatory retirement age. Thereafter, further hearings and oral arguments were held to determine if a permanent injunction should be entered. The issue is ripe for decision.

II. MOTION TO DISMISS
Before proceeding, we must address Defendants' motion to dismiss the EEOC's complaint pursuant to Fed.R.Civ.P. 12(b)(6). Defendants argue that the EEOC is without authority to maintain the present action *1336 to enforce the ADEA, citing Immigration and Naturalization Service v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).
In Chadha, the United States Supreme Court struck down the legislative veto provision contained in the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1). This provision permitted either branch of Congress, by resolution, to invalidate the decision of the Executive Branch in permitting a deportable alien to remain in the United States. The legislative veto was held unconstitutional as violating the doctrine of separation of powers through misapplication of legislative power and procedure.
In their brief in support of their motion to dismiss, Defendants observed that the Reorganization Plan No. 1 of 1978, 92 Stat. 3781, which transferred the authority to enforce the ADEA from the Secretary of Labor to the EEOC, was enacted pursuant to the Reorganization Act of 1977, 5 U.S.C. § 901. The 1977 Reorganization Act permitted the Executive Branch to transfer enforcement authority by either House of Congress vetoing the reorganization plan. Defendants persuasively argue, thus, that the EEOC's authority to enforce the ADEA is void due to the violation of the bicameralism and presentment requirements of the Constitution. See E.E.O.C. v. Allstate Insurance Co., 570 F.Supp. 1224 (S.D.Miss. 1983), appeal docketed, No. 83-4652 (5th Cir. October 19, 1983).
While the legislative veto provision in the 1977 Reorganization Act may be invalid under Chadha, we find that the EEOC continues to have authority to enforce the ADEA. We believe the legislative veto provision is severable from the remainder of the 1977 Reorganization Act and that Congress has subsequently ratified the Reorganization Plan No. 1 of 1978. Moreover, we do not believe the Chadha decision should be applied retroactively to invalidate the transfer of enforcement authority. Retroactive application would create chaos. In support of our position, we rely upon the following cases and the analyses contained therein: E.E.O.C. v. Hernando Bank, Inc., 724 F.2d 1188 (5th Cir.1984); Muller Optical Co. v. E.E.O.C., 574 F.Supp. 946 (W.D.Tenn.1983), appeal docketed, No. 83-5889 (6th Cir. Nov. 29, 1983); E.E.O.C. v. International Mill Service, Inc., No. 83-0749 (E.D.Pa. Feb. 22, 1984); E.E.O.C. v. State of New York, 590 F.Supp. 37 (N.D.N.Y.1984); E.E.O.C. v. Chrysler Corp., 595 F.Supp. 344 (E.D.Mich. 1984); E.E.O.C. v. El Paso Natural Gas Co., No. EP-83-CA-108, (W.D.Tex. Jan. 16, 1984); E.E.O.C. v. CBS, Inc., No. 81-Civ.-2871-JES (S.D.N.Y. Jan. 13, 1984); E.E.O.C. v. Pan American World Airways, 576 F.Supp. 1530 (S.D.N.Y.1984); E.E.O.C. v. City of Memphis, 581 F.Supp. 179 (W.D.Tenn.1983); E.E.O.C. v. Cudahy Foods Co., 588 F.Supp. 13 (W.D.Wash. 1983); E.E.O.C. v. Jackson County, Missouri, 33 Fair Empl.Prac.Cas. 963 (BNA) (W.D.Mo. Dec. 13, 1983).[3]

III. THE ADEA CLAIM

A. The ADEA
Under the ADEA, it is unlawful for any employer to discharge or to discriminate against any individual within the protected age class of forty to seventy because of that individual's age.[4] 29 U.S.C. §§ 623(a)(1), 631. Nevertheless, such otherwise prohibited action is lawful "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, ...." Id. § 623(f)(1). The ADEA's provisions apply equally to private employers and to the State, its subdivisions, and its agencies. Id. § 630(b). See also Equal Employment Opportunity Commission v. Wyoming, *1337 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (extension of ADEA to encompass state and local governments held constitutional).
Congress enacted the ADEA with the purpose "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b); Usery v. Tamiami Trial Tours, Inc., 531 F.2d 224, 229 (5th Cir.1976). In other words, the ADEA permits capable older workers to decide when to retire if they are physically and psychologically able to perform their jobs satisfactorily. E.E.O.C. v. City of Altoona, Pennsylvania, 723 F.2d 4, 6 (3d Cir.1983), cert. denied, ___ U.S. ___, 104 S.Ct. 2386, 81 L.Ed.2d 344 (1984).
"[T]he ADEA is remedial and humanitarian legislation which should be liberally interpreted to effectuate the congressional purpose of ending age discrimination in employment." Bonham v. Dresser Industries, Inc., 569 F.2d 187, 193 (3d Cir.1977), cert. denied, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1979); Beck v. Borough of Manheim, 505 F.Supp. 923, 925 (E.D.Pa.1981). To effectuate this purpose and to stop the very age stereotyping that the Act was designed to prevent, the bona fide occupational qualification (BFOQ) exception to the ADEA's prohibition against age discrimination is to be strictly and narrowly construed, Orzel v. City of Wauwatosa Fire Department, 697 F.2d 743, 748 (7th Cir.), cert. denied, ___ U.S. ___, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983); E.E.O.C. v. County of Santa Barbara, 666 F.2d 373, 376 (9th Cir.1982); Smallwood v. United Air Lines, Inc., 661 F.2d 303, 307 (4th Cir.1981), cert. denied, 456 U.S. 1007, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982); Tamiami, 531 F.2d at 230. Moreover, the court should examine only the particular facts of the case before it. County of Santa Barbara, 666 F.2d 373; Stewart v. Smith, 673 F.2d 485, 491 n. 26 (D.C.Cir. 1982); Tamiami Trial Tours, 531 F.2d at 230; 29 C.F.R. § 860.102(b) (1983).[5]
Defendants assert that the standard we should apply in considering the BFOQ defense should be one of reasonableness: whether the retirement age is a reasonable necessity to the normal operation of the particular business. See Defendant's Post-Trial Brief, at 1-4. Defendants, however, merely parrot the statute, ignoring or misconstruing the overwhelming case law that enunciates a more strict, two-prong standard of review. See Heiar v. Crawford County Wisconsin, 746 F.2d 1190 (7th Cir. Aug. 20, 1984) (rejecting employer's argument that its age policy should be upheld "as long as that policy is `not the result of an arbitrary belief lacking in objective reason or rationale'...."). Without doubt, Congress, in making a policy decision to prevent age discrimination, has created a standard that is not as deferential as that applied in equal protection analysis. Orzel v. City of Wauwatosa Fire Dept., 697 F.2d 743, 749 (7th Cir.), cert. denied, ___ U.S. ___, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983); E.E.O.C. v. County of Santa Barbara, 666 F.2d 373, 376 n. 8 (9th Cir.1982). See also Tuohy v. Ford Motor Co., 675 F.2d 842 (6th Cir.1982) (rejecting test of whether mandatory retirement age is reasonable); Arritt v. Grisell, 567 F.2d 1267 (4th Cir. 1977) (minimal increase in harm standard rejected).
Accordingly, in determining whether a BFOQ exists, the employer must establish (1) that the age limit he invokes is reasonably necessary to the essence of the business, and (2) that he has reasonable cause, i.e., a factual basis, for believing either (a) that all or substantially all individuals within the excluded group are unable to perform their job duties safely and efficiently, or (b) that it is impossible or *1338 impractical to determine the disqualifying trait on an individual basis. E.E.O.C. v. County of Allegheny, 705 F.2d 679 (3d Cir.1983); E.E.O.C. v. University of Texas Health Science Center, 710 F.2d 1091 (5th Cir.1983); Orzel v. City of Wauwatosa Fire Dept., 697 F.2d 743 (7th Cir.), cert. denied, ___ U.S. ___, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983); Tuohy v. Ford Motor Co., 675 F.2d 842 (6th Cir.1982); E.E.O.C. v. City of St. Paul, 671 F.2d 1162 (8th Cir.1982); E.E.O.C. v. County of Santa Barbara, 666 F.2d 373 (9th Cir.1982); Stewart v. Smith, 673 F.2d 485 (D.C.Cir. 1982); Arritt v. Grisell, 567 F.2d 1267 (4th Cir.1977). Once the employee establishes that he/she has been discriminated against on the basis of his/her age, the burden shifts to the employer to establish both prongs of the test. Tuohy, 675 F.2d at 844; City of St. Paul, 671 F.2d at 1166; Smallwood v. United Air Lines, Inc., 661 F.2d 303, 307 (4th Cir.1981), cert. denied, 456 U.S. 1007, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982); Tamiami Trail Tours, Inc., 531 F.2d at 227.

B. Underlying Considerations

1. Statutory age provisions
In an analysis of the ADEA and of the application of the BFOQ defense, various underlying considerations have been addressed by the courts. One aspect is that the general truism that physical capabilities decrease as age increases is not sufficient evidence by itself to establish a BFOQ. The subjective opinions or stereotypical hunches of an employer regarding the effect of age on an employee's ability to perform particular job skills also are not sufficient. Rather, the employer "must demonstrate a specific, objective, or factual basis for its hiring qualifications based on age."[6]University of Texas Health Science Center, 710 F.2d at 1094; Orzel, 697 F.2d at 755; Beck v. Borough of Manheim, 505 F.Supp. 923, 925 (E.D.Pa.1981). See also Houghton v. McDonnell Douglas Corp., 553 F.2d 561 (8th Cir.1977) (company's "intuitive judgment" of when test pilot too old to fly rejected absent factual basis).
Moreover, the mere fact that a mandatory retirement scheme is compelled by a state or local statute does not entitle the legislatively determined retirement age to a statutory presumption of correctness. Orzel, 697 F.2d at 751; City of St. Paul, 671 F.2d at 1167. As the Court of Appeals for the Eighth Circuit has articulated, "we believe that in situations where age could be a BFOQ, Congress did not intend that mandatory retirement statutes be presumed valid. Rather, a case should be made when establishing that age is a BFOQ instead of relying on a legislative fiat." City of St. Paul, 671 F.2d at 1167.[7] *1339 Accord County of Allegheny, 705 F.2d at 681-82; Orzel, 697 F.2d at 751.
Two strong reasons exist for this policy. First, to permit an automatic presumption of validity or legislative deference would switch the burden of proof to the employee from the employer. Additionally, such a stance would unfairly place state and local governments in a better position than private employers. Orzel, 697 F.2d at 751-52; City of St. Paul, 671 F.2d at 1167.

2. Effect of federal mandatory retirement policies
Another consideration under the BFOQ defense is the effect, if any, of the existence of a federal mandatory retirement age as to a similar state or local government occupation. In Johnson v. Mayor And City Council Of Baltimore, 731 F.2d 209 (4th Cir.1984), the Fourth Circuit concluded that Congress' 55-year old retirement age for federal firefighters established a BFOQ for Baltimore's 55-year old mandatory retirement age for its firefighters. The Seventh Circuit rejected this argument, however, in Orzel v. City of Wauwatosa Fire Department, 697 F.2d 743 (7th Cir.), cert. denied, ___ U.S. ___, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983). We find the Orzel opinion to be more soundly reasoned and the correct statement of the law.
It is clear that for a small class of federal public safety employees, Congress has chosen not to be bound by the strict requirements of the ADEA. Mahoney v. Trabucco, 738 F.2d 35 at 41-42 (1st Cir. 1984); Orzel, 697 F.2d at 749; Stewart v. Smith, 673 F.2d 485 (D.C.Cir.1982). As a legal matter, the federal retirement schemes need only pass the rational relation test. Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979); Orzel, 697 F.2d at 749. See also Starr v. Federal Aviation Administration, 589 F.2d 307, 313-14 (7th Cir.1978) (distinguishing between abuse of discretion analysis regarding FAA rule and the BFOQ analysis under ADEA). Under the ADEA, a mandatory retirement age must not only be rational, but it must be reasonably necessary to the operation of the particular business. Orzel, 697 F.2d at 749.
"More important, the fact that Congress has determined that [a certain age] is an appropriate retirement age for one group of [public safety employees] does not automatically establish that the same retirement age is a valid BFOQ, under section 623(f) of the ADEA, for a wholly different group of employees, operating under different working conditions and performing significantly different job functions." Id. at 749. See also Heiar v. Crawford County, Wisconsin, 746 F.2d 1190 (7th Cir.1984) (rejecting BFOQ argument based upon mandatory retirement age for federal law enforcement officers); Tuohy v. Ford Motor Co., 675 F.2d 842 (6th Cir.1982) (FAA age 60 rule held not to establish a valid BFOQ for noncommercial pilots). Indeed, even the Supreme Court has noted that the strength of the federal government's interest in preventing age discrimination by state government and private employers is not negated by the existence of a mandatory retirement age for a small class of federal workers. E.E.O.C. v. Wyoming, 460 U.S. 226, 103 S.Ct. 1054, 1064 n. 17, 75 L.Ed.2d 18 (1983).
In Johnson, supra, the court misconstrued Wyoming and took the phrase "reasonable federal standard", 103 S.Ct. at 1062, out of context. In Wyoming the Court held that the states' discretion to achieve its goals in the way they thought best was not being overridden entirely, but rather was being tested against a "reasonable federal standard", i.e., the ADEA. In the same paragraph, the Supreme Court held that the states still had to demonstrate that age was a BFOQ. To apply Johnson and uphold any state age statute *1340 merely because of the existence of a federal statute concerning similar-occupation employees would render the Supreme Court's opinion meaningless. We concur with the dissent in Johnson that whatever action Congress had undertaken with federal employees has little, if any, relevancy to reaching a correct decision regarding a state mandatory retirement age. Johnson, 731 F.2d at 216-18.
In reaching our conclusion, we are not unaware that some jurists consider that result unfair. See, e.g., Heiar v. Crawford County, Wisconsin, 746 F.2d 1190 (7th Cir.1984) (Gibson dissenting). Senior Circuit Judge Gibson observed in his dissent in Heiar, "[a]s a matter of fundamental fairness, I think that if Congress legislates that age 55 is a bona fide requirement for retirement for federal personnel in the field of law enforcement and firefighters, it ought not and should not under our constitutional system enact different and more stringent restrictions on the state and local units of government, ...." Id. at D-7. Nevertheless, Congress has set different standards, applying a "rationally related" standard to federal mandatory retirement schemes and a "reasonably necessary" standard under the ADEA to state and local mandatory retirement schemes. Id.; Orzel, 697 F.2d at 749. As the Supreme Court has stated, "Once Congress has asserted a federal interest, and once it has asserted the strength of that interest, we have no warrant for reading into the ebbs and flows of political decisionmaking a conclusion that Congress was insincere in that declaration, and must from that point on evaluate the sufficiency of the federal interest as a matter of law rather than of psychological analysis." Wyoming, 103 S.Ct. at 1064 n. 17.

3. The BFOQ and occupations involving public safety
In the case at bar, the mandatory retirement statute is applied to all Pennsylvania state police officers. None of the parties dispute that this occupation of law enforcement involves public safety. Because of society's concern for safety, the question arises as to the effect of a safety factor in establishing age as a BFOQ.
The first circuit court to address this issue initially held that where a business involved a high degree of skill and where the economic and human risks were great, the burden of establishing a BFOQ was lighter. The court thus eased the two-prong test by requiring the employer to show only a rational basis in fact of the employer's belief that increased age increased the risk of harm. Hodgson v. Greyhound Lines, Inc., 499 F.2d 859, 863 (7th Cir.1974), cert. denied sub nom., Brennan v. G.L., Inc., 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975).
Hodgson appears to have been modified or overruled sub silencio by Orzel v. City of Wauwatosa Fire Dept., 697 F.2d 743 (7th Cir.1983). In Orzel, the Seventh Circuit held that while public safety may be a valid local goal, the ADEA required a "particularized inquiry" into age limitations. Id. at 755. The court recognized that with safety as a factor, employers most likely would have less difficulty in demonstrating a BFOQ. Nevertheless, the employer still had to satisfy both prongs of the BFOQ test. Id.
In Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224 (5th Cir.1976), where the two-prong test was first enunciated, the court addressed the question whether the presence of a safety factor should require courts to drop or to modify a component of the BFOQ test. The court decided that safety was important but that this aspect already was appropriately highlighted in the framework of the test through the first prong: safety was considered in determining if an age limit was reasonably necessary to the operation or essence of the business. The greater the likelihood of severity of harm, the more stringent the job requirements could be. Id. at 234-36. See also Arritt, 567 F.2d at 1271 (considering whether the claimed BFOQ was reasonably necessary to the essence of the business, that being the operation of an efficient police department for the protection of the public).
*1341 Thus, the six circuits that have addressed the issue of public safety have not altered the BFOQ test to account for this aspect. Orzel, 697 F.2d at 755-56; Tuohy, 675 F.2d at 844-45; County of Santa Barbara, 666 F.2d at 377-78; Murnane, 667 F.2d at 101; Arritt, 567 F.2d at 1271; Tamiami Trail Tours, Inc., 531 F.2d at 235-36. Rather, public safety's role has been recognized as a competing policy concern calling for a "particular inquiry into the effect of aging on the ability to perform safely...." Tuohy, 675 F.2d 842, 844 (6th Cir.1982). An employer remains compelled to show that a mandatory retirement age is reasonably necessary to the operation of its business.[8]

4. "Business" versus "occupation" differentiation
A serious consideration under the BFOQ analysis, which deeply affects this case, is the interpretation to be given to the word "business" in the ADEA's requirement that a BFOQ be "reasonably necessary to the normal operation of the particular business. ..." 29 U.S.C. § 623(f)(1). Three circuits have addressed this point specifically, with three varying opinions.
In E.E.O.C. v. City of Janesville, 480 F.Supp. 1375 (W.D.Wis.1979), the district court considered the Chief of Police's attack on the city's fifty-five year old mandatory retirement policy for "protective service" employees. The court rejected the city's contention that the "particular business" was the police department as a whole. Rather, in applying the ADEA and the BFOQ test, the court looked towards the particular activities of the particular employee or category of employees. Id. at 1378-79. Thus, the court construed "particular business" as being synonymous with "particular occupation."
The appellate court reversed the lower court's construction as being excessively narrow. E.E.O.C. v. City of Janesville, 630 F.2d 1254, 1258 (7th Cir.1980). The Seventh Circuit panel refused to look beyond the plain meaning of the term "particular business", finding that Congress could have used the word "occupation" for "business" if it had so intended. The court concluded in the case before it that "the City had the burden of establishing that its mandatory retirement program, as applied to the generic class of law enforcement personnel employed by the City to operate the `business' of its police department, falls within the terms of the BFOQ exemption provided under the ADEA." Id.
In E.E.O.C. v. City of St. Paul, 671 F.2d 1162 (8th Cir.1982), the Court of Appeals for the Eighth Circuit disagreed with the Janesville opinion and reasoning. The court affirmed the district court's consideration of different subclasses of firefighting personnel and the lower court's finding that age was not a BFOQ for the city's fire chief.[9] The court stated that the plain meaning of the phrase "bona fide occupational qualification reasonably necessary to the normal operation of the particular business" did not preclude consideration of a particular occupation within a particular business. Id. at 1165.
The St. Paul court also examined the legislative history, finding Congress' intent to be to require employment decisions *1342 based on ability versus age. The court decided that the ADEA's goal would be frustrated if employment decisions were based on a generic class as a whole rather than giving separate consideration to the different occupations within a business. Id. at 1165-66. It would not be difficult to determine these occupations, the circuit found, because a court merely would have to look at the parties before it. The Eighth Circuit concluded, "We cannot believe that the ADEA was intended to allow a city to retire a police dispatcher because that person is too old to serve on a SWAT team." Id. at 1166.
The First Circuit, after reviewing the St. Paul and Janesville decisions, chose to take a middle of the road approach. Mahoney v. Trabucco, 738 F.2d 35 at 38-39 (1st Cir.1984). The court accepted the concept that within any particular business, specific occupations may exist that require their own separate training, career progressions, and age limitations. Id. at 39. With the Massachusetts State Police, however, the First Circuit did not find such distinct occupations to exist but, rather, found officers to have only varying assignments. The court observed the following:
When, however, a person signs up on a paramilitary uniformed force, where one is subject to generally unrestricted reassignment and performance of the most strenuous duties in any emergency, and undergoes the military training required of all recruits, with the expectation of receiving special pension and disability benefits, we would be loath to equate particular "assignments", even if of long duration, to "occupations".
Id. at 39.
In reversing the lower court's decision that the ADEA was best implemented by examining the specific duties of a state police officer, the appellate court observed that under the district court's analysis, any administrative or supervisory position in a strenuous occupation would never be subject to a BFOQ. Id. at 38. In a paramilitary organization, thus, various problems could arise. Poor-risk personnel could be compelled to perform demanding tasks or desk-bound personnel would not be able to be reassigned or called out on emergencies. Furthermore, duty assignments could be affected, interfering with the smooth operation of the system. Additionally, "this approach may also tempt some to seek a `safe harbor' assignment, penalize the dutiful, discourage promotion, encourage litigation, and necessitate judicial determinations that turn on quality judgments, such as how sedentary is the assignment, ...." Id. at 38.
The Mahoney court continued as follows:
The Eighth Circuit case [City of St. Paul] is susceptible of two interpretations. It dealt with the position of fire chief; arguably this position was sufficiently distinct to be considered an occupation separate from that of the rest of the department. But the court in St. Paul went on to say, "we cannot believe that the ADEA was intended to allow a city to retire a police dispatcher because that person is too old to serve on a SWAT team." 671 F.2d at 1166. If this nicety of distinction were to govern, we would have to say that an age limit geared to those performing at critical times the most strenuous function of a unit could not be applied to those performing somewhat less strenuous functions. If such were the law, state troopers engaged in tracking down and apprehending car thieves and drug runners could be subjected to an age 50 retirement requirement, but those who merely had to chase speeders, to attend truck weighing stations, and to apprehend drivers under the influence of alcohol or without proper licenses would not be so subjected. This, we think, would atomize the general concept of "occupation".
Although we can understand why courts have interpreted the statute differently, we think that our interpretation is faithful to the words  that "occupational qualification" means more of a recognized and discrete vocation rather than a desk assignment for an employee subject to all the obligations and benefits of *1343 a quasi-military organization. We also feel, as indeed the district court conceded, that a contrary interpretation, which permits a particularistic analysis of the actual duties performed to overcome an otherwise justified BFOQ for similarly classified employees, would raise immeasurable problems of morale, administration, litigation, and adjudication.
Id. at 39. The First Circuit thus concluded that its approach, "recognizing the need to focus not only on the `particular business' but also on genuine and well recognized occupations within such businesses," would prevent sweeping employees of distinct vocations and occupations into a discriminated generic class. Id. at 42.
After careful consideration of the various viewpoints, we concur with the First Circuit's analysis. Clearly, in certain businesses, particular occupations will exist that will require a separate BFOQ analysis. For example, in any airline company, quite a difference exists between the occupation of pilot versus the occupation of baggage handlers or reservation attendants.
The uniformed personnel of the Pennsylvania State Police cannot similarly be divided. The officers may have varying ranks and assignments but they are essentially equal members of a paramilitary organization. They are all compelled to carry a gun and to take appropriate police action twenty-four hours a day, every day of the year. While officers may be assigned a particular position, they do not have a right to retain that position and are subject to transfer. Any officer can be called out at any time to perform emergency duties, such as to handle a prison outbreak or a riot. Even if an officer is assigned a desk position, if an emergency situation arises at the station (e.g., an attempted prisoner escape during fingerprinting), that officer is expected to be able to handle that situation appropriately. We totally concur with the Mahoney court's recognition of the varying problems that could arise with a more individualistic approach with a quasi-military organization. See Mahoney, at 38-39.[10]

IV. FACTUAL ANALYSIS AND FINDINGS
In the case at bar, the parties have presented ample and respectable evidence ranging from anecdotal stories to medical studies and expert opinion.[11] The evidence addressed a multitude of aspects concerning the effects of aging on physical strength, agility, and conditioning and the skills necessary to perform law enforcement work. To a degree, the testimony and exhibits supported each party's position.
Nevertheless, the ultimate issue before us is whether Defendants [hereinafter the Commonwealth] have met their burden of proof in establishing: (1) that the BFOQ it invokes is reasonably necessary to the essence of the business (here the operation of a safe and efficient law enforcement organization for the protection of the public), and (2) that the Commonwealth has a reasonable factual basis for believing (a) that all or substantially all Pennsylvania State Police officers over the age of sixty are unable to safely and efficiently perform the duties of their job, or (b) that it is impossible or impractical to determine on an individual basis those police officers that possess disqualifying traits which preclude safe job performance.
In their first attack on the Pennsylvania statute and on the Commonwealth's proffered BFOQ defense, Plaintiffs maintain that the legislative history reveals the mandatory retirement statute was passed with the intent to improve morale by increasing *1344 the chances of promotions. The Commonwealth, citing the same legislative history, see EEOC Exhibit 10, claims that the mandatory retirement age was enacted in 1957 because "[i]t is felt that police work is essentially a young man's job...." Id. The Commonwealth argues that this single statement reveals the BFOQ intent behind the legislative act.
We disagree with both the Plaintiffs and the Defendants. The very meager legislative history is merely some indication that the legislature may not have considered safety, and the ability of state police officers to perform their duties when the law was enacted and that the legislative intent may have been primarily to increase promotion opportunities and trooper morale.
We do not however find the issue of the intent underlying the legislative action to be fatal to the Commonwealth's BFOQ defense, however. We concur with the Fifth Circuit's position that the two-prong test does not contain an intent requirement. E.E.O.C. v. University of Texas Health Center, 710 F.2d 1091, 1096 (5th Cir.1983). As the court observed:
While the wording of previous cases can be read in different ways, we think it wiser to interpret the [two-prong] test as requiring the defendant to demonstrate at trial, with objective evidence, that the age qualification is justified, rather than looking to the subjective motivation originally behind the qualification.... We therefore interpret Tamiami's requirements for an age BFOQ as not inviting judicial safaris into the overgrowth of human motivation and intent.
Id. (emphasis in original). Thus, in determining the BFOQ issue, we look to the objective evidence presented by the parties at the time of trial and not to the subjective intent of the 1957 Pennsylvania legislative.[12]
Having reviewed the notes of testimony and the exhibits, we find that the Pennsylvania State Police department is a paramilitary organization with the state-wide goal of law enforcement. While numerous individualistic tasks are performed by the thirty-eight hundred member organization, the overall task is maintaining public safety and enforcing the laws of Pennsylvania. All officers are authorized and responsible for taking necessary police action while "off duty." Officers also are strongly encouraged to carry their issued revolver or a qualified personal revolver when off duty. Additionally, all officers are subject to being called to duty for emergencies. See Defendants' Exhibits 1 & 2. While "off duty" or emergency action is not undertaken frequently, such situations do arise and must be addressed by any member regardless of rank.
We further find that the ranks within the Pennsylvania State Police progress from trooper, corporal, sergeant, lieutenant, captain, major, and lieutenant colonel. At the time of the trial, the following number of members comprised each rank: trooper  2942 (76.8%), corporal  549 (14.3%), sergeant  207 (5.4%), lieutenant  85 (2.2%), captain  33 (0.9%), major  12 (0.3%), and lieutenant colonel  1 (0.02%). EEOC Exhibit 20. Of these ranks, 79% of the State Police members that were 56 years old or older had ranks of corporal or greater. EEOC Exhibit 21.
In the State Police force, greater than 95% of the members begin at the level of patrol troopers. Defendants' Exhibit 12, at 2. In performing his/her job, the trooper performs 554 different tasks, which naturally vary in importance and actual performance.[13] Defendants' Exhibit 12, at 18-39. *1345 These tasks can be broken into components to determine the skills, knowledge, abilities, and personal characteristics (SKAPs) necessary to perform the tasks. In the trooper category, eight measurable physical SKAPs were found to exist, which involved the following dimensions:
 Eye-hand coordination
 Manual dexterity
 Finger dexterity
 Reaction time
 Absolute strength (Pushing car; subduing, restraining, apprehending; lifting, dragging; breaking up fight)
 Relative strength (Climbing)
 Absolute power (Breaking down door/through window; restraining)
 Relative power (Chasing)
 Aerobic endurance (Walking, searching in unfavorable weather)
 Anaerobic-aerobic endurance (Chasing; pushing car, apprehending, carrying)
 Absolute muscular endurance (Subduing, breaking up fights, lifting).
Defendants' Exhibit 14, at 44-63. The above-mentioned physical characteristics of police work were described by every expert presented at the trial, although different terminology was used.[14]
The testimony of various State Police personnel further demonstrated that officers of ranks higher than trooper were expected to be able to perform trooper tasks in addition to their increased responsibilities. The testimony also revealed that, as a practical matter, officers of ranks of corporal or higher performed less strenuous work, such as supervisory or desk work. Nevertheless, although it varied by individual, occasional peak demands of physical action or stress were experienced by officers of any rank.
As to medical expert testimony, all experts agreed that as an individual's age increases, the individual's capability to perform physical functions decreases. The experts further agreed that this decline varies by individual. Moreover, they observed that this decline is of a linear nature with no particular age showing a sharp or sudden drop. Finally, the experts agreed that exercise and training could slow the decline in physical capabilities. It is at this point, however, where the experts' opinions diverged.
The EEOC presented the testimony of Dr. Samuel Fox, an eminently qualified expert in the field of cardiology and internal medicine. See EEOC Exhibit 3. Dr. Fox strongly believed that by maintaining activity, one could function satisfactorily in the sixties better than non-physically active people in their forties. N.T. 2:22 (11/8/83). He stated that it was widely acknowledged that a person has the capability to train and thus delay the slope and rate of physical deterioration "to maintain performance later in life at a level that previously will be considered more usual for younger individuals." N.T. 2:22-23 (11/8/83).
The doctor then proceeded to describe at length the effects of training on numerous physical capacities or functions and his opinion that State Police officers could perform satisfactorily and safely past the age of sixty. Dr. Fox also stated that the *1346 physical capacities necessary to be an officer could be measured by individual tests, such as cardiovascular and stress tests, at a reasonable cost. N.T. 2:2-3 (11/8/83). Dr. Fox concluded that "[a]ge is a relevant factor but my conviction is that age is not the most relevant factor and that other circumstances of past behavior, constitutional endowment and environmental influences are more likely to be influential and that the individual should have the opportunity to demonstrate capability of performing at a significant level, a sufficient level to qualify for continued service beyond any arbitrary age such as age sixty." N.T. 2:44 (11/8/83).
While Dr. Fox testified that training could offset declines in strength, cardiac output, aerobic, and anaerobic capacities, the doctor conceded that the declines would vary by the individual and that the declines due to age could not be totally offset. Dr. Albert Paolone, the Commonwealth's expert in exercise physiology, concurred with Dr. Fox that training could decrease the decline in physical capabilities as age increased, but he was more pessimistic as to the amount of an offset that could occur with such training. Furthermore, he reviewed many physical skills necessary to perform the tasks of a State Police officer and found that as age increased, the officer's ability to perform these functions in light of the officer's and the public's safety would decrease. N.T. 7:36-77 (6/21/83). Unlike Dr. Fox, he did not believe that the aging effect could truly be separated from the effects of lifestyle, genetics, and other factors. N.T. 7:89, 103 (6/21/83). Dr. Paolone stated, "[T]he bottom line is at a given age the physical capacity is lower." N.T. 7:89 (6/21/83). He continued that while testing physical fitness individually could be done, the testing would be more and more precarious to administer and would cost approximately $600.00 per individual. N.T. 7:89-91 (6/21/83).
We turn now to address the evidence submitted by the Commonwealth and vigorously disputed by the EEOC: the physical fitness test battery given by the State Police to members of its force. In summary, the State Police utilized a test battery developed by the Commonwealth's expert, David Wagner, and Management Scientists, Inc. They had developed the test battery to be used by cadets after a training period to determine if the cadets could satisfy the minimum physical performance requirements of a Pennsylvania State police officer. The test battery consisted of the following events: a car push (24 feet), a dummy drag (a 196 pound dummy dragged 24 feet), a sitting shot put (using a 9 pound medicine ball), an obstacle course (600 yards with 4 foot walls), scaling a wall from a hanging position, and pull-ups.
In September and October 1983, the State Police tested officers of all ages and ranks after medical screening. Those candidates that failed the medical screening were sent back to their post to return to duty. Those officers that passed the medical screening were put through each component of the physical fitness test battery. Although the officers were told to do their best, they were also told not to over-exert themselves and to proceed at their own pace. N.T. 1:122-23 (11/7/83). Additionally, they were told that no preestablished standards existed and that there was no such thing as "passing" or "failing." See Binker Exhibit 10 & 12, N.T. 2:81-82 (11/8/83). Furthermore, they were told that the testing was being done to develop a physical fitness maintenance program; officers were not told the results would be used by the Commonwealth in defense of its BFOQ claim. Binker Exhibit 10.
Contrary to the self-serving assertions of the State Police and the Commonwealth, we find that the September and October 1983 physical fitness testing was done to assist in preparing a defense in this action. Moreover, preestablished standards were set for each component. While the officers were not told of the time limitations, such limitations were applied afterwards to determine which officers had passed or failed. We do not condone this testing method.
Turning to the pass/fail standards, the parties extensively contested the validity, *1347 reliability, and predicting capabilities of the test battery results. For each component, the "pass/fail" standard was set by using the mean time of young men  between 21 and 30 years of age. N.T. 3:59-63 (11/9/83). The State Police's position was that an officer had to pass each component to pass the entire test battery. Accordingly, if an officer failed a single component by a single second, that officer was deemed to have failed. We also note that the State Police's position is that its standards describe the minimum physical requirements of State Police work.
On the whole, we must reject the Commonwealth's position and many of its conclusions regarding the test battery results. As Defendants' own expert admitted, if many people fail or pass a test, the test may be valid but it is not a practical measuring tool. N.T. 1:100-101 (11/7/83). If we accept the Commonwealth's position that an officer is not qualified to perform the minimum necessary physical tasks of State Police work if the officer failed the test battery, then not a single Pennsylvania State Police officer over the age of forty-five is capable of performing his/her job. Moreover, at least 94% of those officers between ages 40 and 44 would not be minimally qualified, 91% of those officers between ages 35 and 39 would not be minimally qualified, and 81% of those officers between ages 25 and 34 would not be minimally qualified. See Appendix, Exhibit A, part II.
Nevertheless, some of the test results are helpful in giving a practical example of the general aging effect that occurs with State Police officers. In the Appendix as Exhibit B are the mean time or distance performances of the eight age categories of officers per battery component. In the Appendix as Exhibit C and D are charts representing the mean performances of each age group relative to the best score of a particular age group. See N.T. 3:28-37 (11/9/83).
A review of this data and of the expert testimony reveals a linear decline in performance capabilities as age increases. While the decline was almost immediate after the first age group (20 to 24), the most noticeable drop appeared between 45 and 50. See Appendix, Exhibits B, C, D and EEOC's Exhibit 37, Chart 2. The evidence thus showed that not only is there a significant decrease in performance capabilities at age 60 but that this decrease begins earlier at the ages of 45 to 50.
The EEOC argues that because a noticeable decrease in task performance occurs earlier than the age of 60, then a mandatory retirement age of 60 is not a BFOQ. The Commonwealth counters that 60 is indeed a BFOQ even though an earlier retirement age could be justified. The Commonwealth's rationale is that it must prove only that the retirement age of 60 is a BFOQ and not that there is a better age. They argue that they have justified the legislative determination of 60 and that the court should not interfere with that selection.
To an extent, we agree with the Commonwealth. It is our role to determine if the Commonwealth has met its burden of proof in establishing a BFOQ. It is not our role to tell the legislature that we think an earlier age is more appropriate. Nor can we legislate and tell the State Police that they should train and test their members annually although we, and Defendants' own personnel, believe that idea to be the best and most sensible method of watching over the officers' health and performances. N.T. 7:106 (6/21/83).
In age discrimination cases involving mandatory retirement provisions, there is never going to be a bright line indicating the exact age at which substantially all personnel cannot satisfactorily and safely perform their duties. No one will ever prove that age 59 is different from 60 or that age 44 is different from 45. The legislature and the respective state agencies can only try their best to determine a general age area where individuals cannot perform sufficiently if individual testing is impossible or impractical. Then they must specify a particular age. In the present case, age 45 or 50 might be a better BFOQ. But the Commonwealth has to balance that consideration *1348 with its interest in having a sufficiently staffed and experienced police force to protect the welfare of its citizens. "The overall effectiveness of any police force obviously depends on both the quality and number of individual members." University of Texas Health Science Center, 710 F.2d at 1096.
In light of the above discussion, we find that the Commonwealth has satisfied its burden of proof on both prongs of its BFOQ defense. We find that the Pennsylvania State Police is a paramilitary organization where the mandatory retirement age is reasonably necessary to the operation of a safe and efficient law enforcement organization. We further find that the Commonwealth has demonstrated a reasonable objective basis for believing that substantially all of the State Police officers over the age of sixty are unable to safely and efficiently perform the necessary physical duties of their job. Moreover, it would be impractical to test on an individual basis to determine those officers that have the full capabilities of safe job performance. While we recognize that many tests can be done to discover many physical capabilities and diseases, we do not believe testing is practical or economically feasible in the present case. We agree with Dr. Paolone's conclusion that testing cannot safely measure all dimensions in everyone. Moreover, as Dr. Paolone recognized, annual testing of all officers would be necessary for accuracy. N.T. 7:10 (6/21/83). Such testing would place an unreasonable burden, both administratively and financially, upon the State Police force.

V. CONCLUSIONS OF LAW
We conclude that Defendants have met their burden of proof that the mandatory retirement age of sixty for Pennsylvania State Police officers is a BFOQ. Accordingly, the mandatory retirement statute, 71 P.S. § 65(d), is valid and is not in violation of the ADEA. Furthermore, we find that the compulsory retirement statute does not violate the Equal Protection and Due Process clauses of the Constitution.[15]
An appropriate order will be entered.

ORDER
AND NOW, this 24th day of October, 1984, in accordance with the accompanying memorandum, IT IS HEREBY ORDERED and declared that:
1. The Pennsylvania mandatory retirement statute, 71 P.S. § 65(d) (Purdon's Supp.1984-1985), is not in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621-634; nor does the statute violate the Due Process or Equal Protection clauses of the United States Constitution.
2. Plaintiffs' motion for a permanent injunction against Defendants to restrain the involuntary retirement of Pennsylvania State Police officers who reach the age of sixty is denied.
3. The prior orders preliminarily enjoining the involuntary retirement of certain Pennsylvania State Police officers will be dissolved on October 31, 1984, unless an application is made by Plaintiffs for an injunction pending appeal pursuant to Fed. R.Civ.P. 62(c). The preliminary injunction orders and individuals so affected are as follow:

Date of order Affected individuals
June 27, 1983 Lt. Otto J. Binker
 Edward A. Poplawski
August 3, 1983 Leonard P. Morgan
September 28, 1983 W. E. Wertz, Michael Donohoe,
 Robert Gorman

*1349
December 19, 1983 Francis McGann, Joseph Dean
January 3, 1984 Leon F. Salada, John S. Mengak
March 27, 1984 George J. Martin
May 29, 1984 Thomas Osieski, Franklin Fetterolf
August 7, 1984 John J. Flannery
September 13, 1984 Francis A. Aruscavage,
 Walter Mackiw
September 14, 1984 Daniel Wengrenovich
October 4, 1984 Jack P. Bednar

4. Each side is directed to bear its own costs. Accordingly, the pledges of the individuals enumerated in paragraph 3 of this order, which were entered into during the duration of this case and which permitted any damages suffered by Defendants to be withdrawn from the above-named Pennsylvania State Police officers' retirement funds, are dissolved.

APPENDIX

EXHIBIT A

I. Car Push  distance of 24 feet.
Result: All passed in all age groups.
II. Obstacle Course  Run 600 yards and climb over six 4-foot walls in 135 seconds.
 Age Group Pass % Fail %
 20-24 80 20
 25-29 24 76
 30-34 13 87
 35-39 9 91
 40-44 6 94
 45-49 0 100
 50-54 0 100
 55-59 0 100
III. Dummy Drag  Pull 196 pound dummy from behind steering wheel and drag 24
feet to a stretcher.
Result: All passed but one individual in 40-44 category and one individual in 50-54
category.
IV. Wall Climb  Scale wall from hanging position.
 Age Group Pass % Fail %
 20-24 100 0
 25-29 85 15
 30-34 79 21
 35-39 86 14
 40-44 74 26
 45-49 62 38
 50-54 45 55
 55-59 48 52
Source: Defendants' Exhibit 30.

*1350 EXHIBIT B

 Mean Performance Times/Distances
 Obstacle Dummy Wall Sitting
 Car Push course drag climb shot put
 Age Group time (sec.) time (sec.)[*] time (sec.) time (sec.) distance (inches)[**]
 20-24 11.9 130.6 20.9 4.9 182.7
 25-29 12.8 147.3 18.8 5.6 176.2
 30-34 12.6 162.3 19.8 5.9 172.2
 35-39 12.9 167.9 19.4 6.9 164.3
 40-44 13.4 192.9 22.9 7.6 162.6
 45-49 13.3 205.1 23.3 9.5 161.1
 50-54 15.0 223.8 23.7 7.5 157.8
 55-59 15.2 230.7 32.5 9.4 146.7
Source: Defendants' Exhibit 30.

*1351 EXHIBIT C

*1352 EXHIBIT D

NOTES
[1] This law does not apply to the State Police Commissioner and Deputy Commissioner. 71 P.S. § 65(d).
[2] Plaintiff Binker also has attacked the Pennsylvania act as a denial of equal protection and due process. The discussion of these issues is contained infra at 1348.
[3] Copies of these cases are attached to the EEOC's Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss, Docket entry 175.
[4] Included in the ADEA's prohibitions is involuntary retirement premised on age. 29 U.S.C. § 623(f)(2); E.E.O.C. v. Westinghouse Electric Corp., 725 F.2d 211, 223 n. 8 (3d Cir.1983); E.E.O.C. v. City of Altoona, 723 F.2d 4, 6-7 (3d Cir.1983).
[5] While the interpretations of the agencies enforcing the ADEA are not binding upon us, they are entitled to considerable weight. Orzel, 697 F.2d at 748, citing, Griggs v. Duke Power Co., 401 U.S. 424, 433-34, 91 S.Ct. 849, 854-55, 28 L.Ed.2d 158 (1971); and Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).
[6] In a more recent opinion, the Seventh Circuit rejected the employer's claim that a mandatory retirement should be upheld if the employer established a good faith judgment. The court stated the following:

If a good-faith judgment, based on a loose fit between the needs of the job and the effects of age, were enough to bring a mandatory retirement policy within the shelter of section 623(f)(1), the Act would have little bite. Older people in our society are not a despised and powerless minority; and mandatory retirement laws, rather than being manifestations of vicious, exploitive, or unreasoning prejudice, are for the most part efforts  crude and arbitrary perhaps but not malicious  to balance the costs of a fixed retirement age in sometimes forcing out perfectly fit employees with the benefits in avoiding individualized evaluations of fitness, evaluations both costly for the employer to make and potentially humiliating for the individual employee to receive. To exempt from the Act mandatory retirement policies just because they were adopted in good faith and struck a reasonable balance between the relevant costs and benefits would therefore deprive the Act of much of its intended effect in helping older people retain their jobs longer. The language of the statute, commanding that any mandatory retirement law under 70 be not only reasonable but reasonably necessary, is against such an interpretation.
Heiar v. Crawford County, Wisconsin, 746 F.2d 1190 (7th Cir.1984).
[7] In St. Paul, the Eighth Circuit noted but rejected the Seventh Circuit's position that a legislative determination regarding a mandatory retirement age was entitled to a statutory presumption of correctness. See E.E.O.C. v. City of Janesville, 630 F.2d 1254, 1259 (7th Cir.1980). We further observe that the Janesville decision was enounced in the context of an appeal from the entry of a preliminary injunction against the city. The appellate court held that the mandatory retirement age of fifty-five for firemen, in the context of a preliminary injunction proceeding seeking the extraordinary remedy of reinstatement, should be presumed a BFOQ in considering whether the plaintiff was likely to succeed on the merits. Id. at 1258-59. Additionally, the Seventh Circuit's initial view appears to have changed. See, e.g., Orzel, 697 F.2d at 751.
[8] "When safety is `the essence' of the particular business, that factor obviously becomes an important occupational consideration. Consequently, employers whose businesses are safety-related have less difficulty proving that age is a BFOQ." County of Santa Barbara, 666 F.2d 373, 377 (9th Cir.1982) (footnote omitted); Murnane, 667 F.2d 98, 101 (D.C.Cir.1981); Beck v. Borough of Manheim, 505 F.Supp. 923, 926 (E.D.Pa. 1981). As the Sixth Circuit held in concluding that a safety element did not alter the "reasonably necessary" prong:

The presence of an overriding safety factor might well lead a court to conclude as a matter of policy that the reasonable necessity of a BFOQ is relatively low. However, this is quite different from dispensing with the requirement of necessity and holding that a BFOQ has been established as a matter of law because adoption of a rule based on age was reasonable.
Tuohy, 675 F.2d at 845 (citations omitted).
[9] The district court did find that the mandatory retirement age of 65 was a valid BFOQ for firefighters, fire equipment operators, and fire captains. 671 F.2d at 1167.
[10] Furthermore, we observe that the Commonwealth has already distinguished between the "occupations" existing within the Pennsylvania State Police. The mandatory retirement age applies to members of the Pennsylvania State Police force. Civilian employees, who do not undertake law enforcement activities, are considered a distinct branch or "occupation" and are not subject to the provisions of 71 Pa.C.S.A. § 65.
[11] The evidence was presented at three separate hearings in regard to Plaintiffs' motions for a temporary restraining order, a preliminary injunction, and a permanent injunction.
[12] Additionally, in Wyoming the Court noted that the state could continue to mandatorily retire game wardens at the age of fifty-five if they could prove that age was a BFOQ for the job of game warden. Such a statement implies that a BFOQ can be established prospectively. See Wyoming, 103 S.Ct. at 1064.
[13] At this point, we acknowledge that many of the statistics we use as to trooper tasks and other tasks performed in the upper ranks derive from the testimony of Defendants' industrial psychologist expert, David Wagner, and the extensive study he performed through Management Scientists, Inc. concerning the Pennsylvania State Police Selection/Promotion Standards Development and Validation Project. See N.T. 6:12-75 (6/20/83), 1:12-105 (11/7/83) & Defendants' Exhibits 12, 14-19, 23A. The EEOC strongly criticized this report, arguing that it was developed under a consent decree from a case involving the hiring and promotion of minorities and not involving age. We find the study to be thorough and valid to the extent it made a detailed analysis of the tasks performed by each rank. As to the tests developed to measure the skills necessary to perform these tasks and as to the application of the study to the physical fitness test battery undertaken by the State Police, these issues are discussed infra.
[14] Put more simplistically, the capacities necessary to perform the job of State Police officer include: the aerobic capacity to run and pursue a suspect; the strength to disengage automobiles or to assist accident victims; the coordination to shoot firearms; the intact reflexes to operate automobiles at a highly demanding level of skill in all weather conditions; the visual, auditory, and other senses to be aware of circumstances in the environment; and freedom from disabling diseases or disqualifying diseases that compromise an individual's "ability to perform under stresses of long hours and taxing physiological circumstances." N.T. 2:3-4 (11/8/83).
[15] Plaintiff Binker's equal protection claim fails in light of the Supreme Court's decision in Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). Plaintiff has failed to distinguish Murgia and its application to the present case. Additionally, Plaintiff has failed to establish any due process violation.
[*] Cut-off point to pass: 135 seconds
[**] Cut-off point to pass: 150 inches