EQUAL EMPLOYMENT OPPORTUNITY COMMISSION and Lieutenant Otto J. Binker, Plaintiffs,

v.

COMMONWEALTH OF PENNSYLVANIA, Pennsylvania State Police, and the Commissioner of the Pennsylvania State Police, Defendants.

Civ. No. 83–0321.

United States District Court, M.D. Pennsylvania.

Oct. 22, 1986.

Robert P. Casey, Dilworth, Paxson, Kalish & Kauffman, Scranton, Pa., John L. Heaton, Dilworth, Paxson, Kalish & Kauffman, Harrisburg, Pa., for plaintiff Binker.

Reginald L. Sydnor, Louis Rodriguez, Alicia G. Burkman, and Susan DeLarm, Philadelphia, Pa., and Barbara L. Kosik, Asst. U.S. Atty., U.S. Attorney's Office, Scranton, Pa., for plaintiff E.E.O.C.

K. Douglas Daniel, Joseph S. Rengert, Harrisburg, Pa., for Com. of Pa., Pa. State Police.

Brett O. Feese, Williamsport, Pa., and Frank Niemiec, Towanda, Pa., for applicants for intervention.

## MEMORANDUM

HERMAN, District Judge.

On July 19, 1985, the Court of Appeals for the Third Circuit remanded the above action to this court for reconsideration of the record and additional particularized fact-finding. The parties have supplemented the record at additional hearings in September, 1985 and April, 1986, and the case is now ripe for our decision.

As the parties well know, Pennsylvania law currently provides that any member of the Pennsylvania State Police, regardless of rank, who reaches the age of sixty, must resign from the force, unless at that age he has attained less than twenty years of service. 71 P.S. § 65(d). Plaintiffs in this case attack the validity of this law under The Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634. Plaintiff Binker also attacks this act as a denial of equal protection and due process. The Commonwealth defends, asserting that the mandatory retirement age is a bona fide occupational qualification (BFOQ) reasonably necessary to the operation of the Pennsylvania State Police. 29 U.S.C. § 623(f)(1).

## I. PRIOR HISTORY

In our first decision of this case, *Equal Employment Opportunity Commission v. Commonwealth of Pennsylvania*, 596 F.Supp. 1333 (M.D.Pa.1984), we held that the mandatory retirement age of sixty is a bona fide occupational qualification. In reaching our decision, we held that the defendants, in order to establish their BFOQ defense, were required to prove (1) the existence of a job qualification reasonably necessary to the essence of the State Police business, *and* (2) that they have reasonable cause for believing *either* (a) that all or substantially all individuals within the excluded group are unable to perform their duties safely and efficiently, *or* (b) that it is impossible or impractical to determine the disqualifying trait on an individual basis. *Id.* at 1337–1338; 1343.

We also held that, although the majority of State Police officers, once they reach age sixty, hold ranks higher than Trooper, the relevant occupation for evaluation of the BFOQ defense is that of Trooper. This holding was based on the fact that all officers, even though they may have varying ranks and assignments, are essentially equal members of a paramilitary organization:

> They are all compelled to carry a gun and to take appropriate police action twenty-four hours a day, every day of the year. While officers may be assigned a particular position, they do not have a right to retain that position and are subject to transfer. Any officer can be called out at any time to perform emergency duties, such as to handle a prison outbreak or a riot. Even if an officer is assigned a desk position, if an emergency situation arises at the station (e.g., an attempted prisoner escape during fingerprinting), that officer is expected to be able to handle that situation appropriately.

*Id.* at 1343.

On appeal, the Third Circuit affirmed both of these holdings, but concluded that we had not made sufficiently particularized factual findings supporting our conclusion that good health and physical fitness and strength are job qualifications reasonably necessary to the essence of the State Police business (the first prong of the BFOQ test). *Equal Employment Opportunity Commission v. Commonwealth of Pennsylvania*, 768 F.2d 514, 518 (3d Cir.1985). In ordering a remand, the court suggested that we further elaborate our findings with respect to both prongs of the BFOQ test, *id.* at 518, fn. 3, but it made clear that the legal standard we had applied and the occu-

pation we had assessed in our initial ruling on the case were the proper ones:

> Given the undisputed evidence of the traditional police duties incumbent upon all PSP officers, we believe that the district court was correct in finding that PSP is a paramilitary organization as defined by the First Circuit in *Mahoney* [*v. Trabucco*, 738 F.2d 35, 39 (1st Cir.1984)]. We believe, moreover, that the *Mahoney* formulation is correct for defining "occupations" in paramilitary police organizations where all relevant personnel are required to be ready for emergency action, regardless of rank and general duties. We hold, therefore, that the district court applied the proper legal standard in determining whether the age limitation is a BFOQ.

*Id.* at 517.[1]

Our task now is to review the record, including the supplementary evidence adduced at the September and April hearings, to determine if the State Police have in fact met their burden of proving a BFOQ under the standard outlined in our original decision as affirmed by the Third Circuit. We accordingly make the following findings of fact.

## II.  FINDINGS OF FACT

A.  *Pennsylvania State Police department is a paramilitary organization.*

1. All officers are authorized and responsible for taking necessary police action while "off duty." Officers are also strongly encouraged to carry their issued revolver or a qualified personal revolver when off duty. All officers are subject to being called to duty for emergencies. (Defendants' exhibits 1 and 2).

2. While "off duty" or emergency action is not undertaken frequently, such situations do arise and must be addressed by any member regardless of rank. (N.T. 3:75 (6/13/83); 6:81–83 (6/13/83); 7:57 (11/7/83); 7:74 (11/7/83)).[2]

Officers of higher ranks than Trooper are called upon to perform the tasks of a Trooper in the normal course of their work, including performing such physical tasks as assisting stranded motorists in snow storms, pushing disabled vehicles off the roadway, chasing suspects on foot, chasing suspects by vehicle at speeds of seventy to eighty miles per hour, subduing suspects, and removing victims of accidents from wrecked vehicles. (N.T. 6:45 (6/13/83); 6:93–94 (6/13/83); 6:110–112 (6/13/83); 7:56 (11/7/83); 7:66–71 (11/7/83)).

B.  *Good health and physical fitness, strength, and dexterity are job qualifications reasonably necessary to the essence of the State Police business.*

1. The industrial psychologist, David J. Wagner, expert witness for the State Police, performed a job analysis for the State Police in which he identified 554 tasks performed by a Trooper. (Defendants' exhibit 12).

2. Mr. Wagner arrived at this list of 554 tasks by conducting a series of in-depth interviews with state police officers to find out what they did in their jobs. (N.T. 6:15 (6/13/83)).

3. The preliminary list of tasks culled from the interviews was verified and modified through a series of questionnaires completed by three to four hundred state police troopers. (N.T. 6:15 (6/13/83)).

4. Each of these 554 tasks finally identified can be broken down into components to determine the skills, knowledge, abilities, and personal characteristics necessary

---

**1.** The Third Circuit also vacated our prior order denying the petition to intervene of a younger group of officers and remanded the petition to this court for reconsideration. None of the original petitioners expressed any desire to participate in the hearing on remand. Nevertheless, on September 24, 1986, we issued an order directing any applicants for intervention who still desired to intervene to file renewed applications for intervention on or before October 6, 1986. No applications were filed, and we therefore deem any former applications to be withdrawn. We will not further address these applications.

**2.** The notation "N.T. 3:75 (6/13/83)" means Notes of Testimony from the hearing that commenced on June 13, 1983, volume 3, page 75.

**1548**

to perform the tasks. (Defendants' exhibit 12).

5. Analysis of the tasks and the skills, abilities, knowledge, and personal characteristics required to perform these tasks reveals that there are eleven physical abilities or dimensions which are necessary for the adequate performance of the job of a State Trooper. (Defendants' exhibit 14 at 44–63).

6. These eleven physical dimensions required to perform the job of a State Police Officer are as follows:

a. Eye-hand Coordination—the ability to make precise movements of the hands when vision is used.

b. Manual Dexterity—speed of skilled arm-hand movements of relatively large objects.

c. Finger Dexterity—the ability to manipulate small objects which primarily involves the use of the fingers.

d. Reaction Time—the speed with which an individual is able to respond to a stimulus.

e. Absolute Strength—strength in moving a heavy object other than body weight or applying force to an immovable object (e.g., pushing car; subduing, restraining, apprehending; lifting; dragging; breaking up fight).

f. Relative Strength—strength in moving body weight, or strength per pound of body weight (e.g., climbing).

g. Absolute Power—strength or force in moving an external weight quickly and explosively (e.g., breaking down door, breaking through window; restraining).

h. Relative Power—strength or force in moving body weight quickly and explosively (e.g., chasing, dodging obstacles).

i. Aerobic Endurance—endurance in moving large muscle groups repeatedly for three minutes or more but preferably over five minutes (e.g., chasing for longer distances, walking, searching).

j. Anaerobic-Aerobic Endurance—endurance in moving large muscle groups repeatedly for at least one minute but not for more than two minutes (e.g., chasing for shorter distances; pushing car; apprehending; carrying, dragging).

k. Absolute Muscular Endurance—endurance in repeatedly lifting an external weight, or sustaining it by an isometric contraction (e.g., apprehending; breaking up fights; lifting). (Defendants' exhibit 14 at 44–63).

7. Put more simply, the physical capacities necessary to perform the job of a State Police Officer include the aerobic capacity to run and pursue a suspect; the strength to disengage automobiles, to assist accident victims, or to drag incapacitated victims from dangerous situations; the coordination to handle firearms; the intact reflexes to operate automobiles at a highly demanding level of skill in all weather conditions; the visual, auditory and other sensory capabilities to be aware of circumstances in the environment; and freedom from disabling disease that would compromise an individual's "ability to perform under stresses of long hours and taxing physiological circumstances." (N.T. 2:3–4 (6/13/83)).

8. Approximately 137 of the 554 tasks identified by defendants' expert require one or more of the following psychomotor capabilities or dimensions in order to be performed adequately:

—eye-hand coordination
—manual dexterity
—finger dexterity
—reaction time

(Defendants' exhibit 14 at 46–48).

9. Among those tasks which depend to a high degree on the above psychomotor dimensions for adequate performance are:

—checking victims of accidents for injury and administering first aid
—pursuing, overtaking, and stopping another motorist at high speeds
—skillfully and accurately handling firearms
—subduing and restraining a suspect or a participant in a fight
—investigating crimes and collecting evidence
—skillful operation of patrol car at all speeds and in all weather conditions

(Defendants' exhibits 12 and 14).

10. Approximately forty-four of the 554 tasks require one or more of the following

physical performance dimensions in order to be performed adequately:
- —absolute strength
- —relative strength
- —absolute power
- —relative power
- —aerobic endurance
- —anaerobic-aerobic endurance
- —absolute muscular endurance

(Defendants' exhibit 14 at 50).

11. Among those tasks which depend on the above physical dimensions for adequate performance are:
- —pushing a car off the road
- —subduing, restraining, apprehending suspects
- —lifting, dragging, carrying persons, animals, inanimate objects
- —breaking up fights
- —climbing over obstacles in the course of a chase or climbing onto large vehicles in the course of inspecting them
- —breaking down doors and smashing windows
- —chasing suspects fleeing on foot
- —walking or searching for suspects or missing persons

(Defendants' exhibits 12 and 14).

12. Testimony elicited from several active state police officers, and from expert Wagner, confirms that troopers and, indeed, their superiors, are required to, and do, perform the tasks summarized in paragraphs 7 and 9, above. (N.T. 6:45, 52 (6/13/83); 6:81–83 (6/13/83); 6:93–94 (6/13/83); 6:110–112 (6/13/83); 7:56–57 (11/7/83); 7:66–71 (11/7/83); 7:74 (11/7/83)).

13. The purpose of the State Police business is to protect the livelihood, property, and well-being of citizens of the Commonwealth of Pennsylvania. (N.T. 1:22 (11/7/83)); the essence of the business is, therefore, safety.

14. The Pennsylvania State Police began in 1982 to develop a health and physical fitness training program for its members. (Defendants' Exhibit 52; N.T. 2:102 (11/7/83); 1:71 (4/7/86)).

15. The purpose of this program is to enhance the general fitness of the membership of the Pennsylvania State Police Force. When fully in place, it will have two parts, one the medical health assessment of the individual and the other a training program designed to assure that officers can perform the tasks of a state police officer demanding physical strength, agility, and dexterity. (N.T. 2:33 (11/7/83); 1:25 (4/7/86)).

16. As of the date of the April, 1986 hearing, the research phase of the program had been completed, and the developmental phase had been entered. State Police officers have all completed "Medical Screening and Personal History Assessment" forms designed to aid in the development of a detailed physical profile of each member of the State Police force. Fitness coordinators, officers selected from each troop who are in charge of conducting fitness assessments, have been selected and trained. A $40,000 contract for blood testing of all officers has been let and the testing has been completed. Approximately $60,000 worth of health and fitness testing equipment has been purchased. (Defendants' exhibits 53–56; N.T. 1:74–78, 81 (4/1/86)).

17. In the future, the department will undertake quarterly assessments of the physical fitness of its members, will write exercise prescriptions for each member, and will provide education in stress management, nutrition and weight control. Eventually, mandatory fitness standards will be implemented. (N.T. 1:78–84 (4/7/86)).

18. Prior to the institution of this newest fitness program, the state police did pursue limited monitoring of the health and fitness of the members. Troopers were and are required to report to their supervisors any medical or physical deficiency that may affect their performance. In certain circumstances, officers are required to provide their superiors with a complete diagnosis and prognosis of their condition from the treating physician. Troop commanders and Bureau or Division directors may order physical examinations for an officer if they feel that an officer's ability to perform an

assigned task is in any way impaired. (N.T. 1:11–16 (4/7/86); Defendants' exhibits 43, 48).

19. Beginning in 1974, the State Police began monitoring the weight and other medical deficiencies of all members of the force on a semi-annual basis. In the last year, monitoring has been performed on a quarterly basis. All data is reported in the semi-annual or, now, quarterly, Medical Deficiency Status Report. Members who have a medical deficiency other than being overweight are required to submit to their commanding officer a program of proposed treatment as prescribed by their family physician. (N.T. 1:16–17 (4/7/86); EEOC exhibit 8).

20. The State Police maintains a limited duty status program for those officers who are unable to perform the full range of duties required of a trooper. Generally, this program is for officers who are temporarily disabled and who will be rehabilitated and returned to work. Any officer on limited duty status must submit to the State Police quarterly medical reports indicating their diagnosis, prognosis, and length of time their status is expected to continue. At any given time, less than two percent of the State Police membership is assigned to limited duty status. (N.T. 1:18–20, 43–44 (4/7/86); Defendants' exhibit 51).

21. Performance of the duties of a state police officer in a manner that does not endanger the public, and that does guard the well-being and safety of the citizens of Pennsylvania requires that police officers be in good health, be physically strong, and have agility, dexterity, and stamina.

C. *The Pennsylvania State Police are compelled to rely on the mandatory retirement of officers at age 60 as a proxy for individual testing of older officers for the presence of the good health, physical fitness, strength and dexterity required to perform the job of a state police officer.*

1. As an individual's age increases, his ability to perform physical functions decreases. (N.T. 2:11–12 (6/13/83); 5:54–56 (11/7/83)).

2. Exercise and training can slow the decline in physical capabilities to some extent. (N.T. 2:147–148 (6/13/83)).

3. The decrease in psychomotor functions and capability (eye-hand coordination, manual dexterity, finger dexterity, reaction time) is sharper after 60 than after 50. (N.T. 2:147–149 (6/13/83)).

4. Between ages 25 and 60, eye-hand coordination, manual and finger dexterity decrease by about 15%. (N.T. 7:41 (6/13/83)).

5. Between ages 20 and 60, response time or movement time (the time required to complete the appropriate response once it is initiated) decreases by about 21%, while reaction time (the time required to initiate action) decreases by about 43% (N.T. 7:41–42 (6/13/83)).

6. Exercise and training slows the decline in the neuromuscular and coordinative area to a lesser extent than in other physical performance areas. (N.T. 2:147–148 (6/13/83)).

7. Aerobic capacity decreases as a person's age increases. By age 60, an individual experiences as much as a 35–40% decrease in aerobic capacity from age 20. (N.T. 2:149–161 (6/13/83); 5:54–56 (11/7/83); 6:32 (11/7/83)).

8. The average decrease in aerobic capacity between a group of men whose average age was 26 and another group whose average age was 58 was 57%. The average aerobic capacity for 26 year olds, in milliliters per kilogram of body weight per minute was 42.07, while the average for the 58 year olds was 23.8 (N.T. 7:60–62 (6/13/83)).

9. The most drastic decline in aerobic capacity occurs past the age of 60. (N.T. 7:64 (6/13/83)).

10. Although training can increase aerobic capacity, aerobic capacity is a function of cardiac output or stroke volume. It is unlikely that training can significantly

increase stroke volume in older people because of the structural changes in the heart that occurs with aging. (N.T. 7:66–67 (6/13/83)).

11. The effect of an age-related decrease in aerobic capacity is to cause the older person to fatigue much sooner than a younger person, and to cause the older person to recover much more slowly from aerobic exertion. (N.T. 7:67–68 (6/13/83)).

12. It is more likely that individuals over sixty years of age would have hidden coronary problems than younger people. (N.T. 2:188 (6/13/83)).

13. At least 15 percent of all 60 year olds in the general population are likely to have hidden coronary problems. (N.T. 2:188 (6/13/83)).

14. Between ages 20 and 60 a person also experiences a decline in absolute strength. This decline can be offset somewhat by training, but the older a person is, the less offset there would be, because there is a decrease in trainable muscle as the body ages. (N.T. 7:46–47 (6/13/83)).

15. Between ages 29 and 50, there is a decline in relative strength of about 35%. The decline continues past the age of 60. (N.T. 7:48–51 (/13/83)).

16. Between ages 30 and 60, there is a 30% loss in absolute muscular endurance. (N.T. 7:53, 55 (6/13/83)).

17. Decrease in relative strength and muscular endurance cannot be totally offset by training because of the decrease in lean muscle tissue as the body ages. (N.T. 7:54 (/13/83)).

18. Between ages 29 and 50 there is a 20% decline in relative power. The decline continues beyond age 60. (N.T. 7:56 (6/13/83)).

19. There is also an age-related effect on anaerobic/aerobic capacity. In short bouts of high level activity, such as a timed rescue drag, a 60 year old cannot move as quickly or as repeatedly as a younger person. (N.T. 7:69–70 (6/13/83)).

20. It is highly unlikely that a person would be able to offset the decrease in anaerobic capacity that occurs with age. (N.T. 7:70 (6/13/83)).

21. Many of the physical tasks of a police officer require more than one of the physical capacities identified above. Where this is the case, the effect of a decrease in more than one of the supporting capacities would be at least additive, and perhaps greater than additive on performance. (N.T. 7:73 (6/13/83)).

22. When there is an average decrease of a certain percent of capacity with age in any of the above dimensions, one can expect that 67% of the population falls within plus or minus one standard deviation of that average percent. The standard deviation for these figures, according to defendants' expert, is plus or minus 10%. For an average decrease of 30%, therefore, 67% of the population will fall somewhere between a decrease of 20% and 40%. (N.T. 7:76 (6/13/83)).

23. Substantially all officers between ages 56 to 60 on the Pennsylvania State Police force have at least a moderately high risk of developing cardiovascular disease within the next ten years. When defendants' expert Wagner performed the risk analysis for cardiovascular disease recommended by plaintiff's expert Mostardi, out of 99 officers sampled in the 56 to 60 age group, nearly 86% had a moderately high or higher risk of developing cardiovascular disease. (Defendants' exhibits 32 and 38; N.T. 6:112–115 (11/7/83); 7:103 (11/7/83)).

24. Police work, in general, leads to cardiovascular disease. (Defendants' exhibits 32 and 65).

25. An officer with hidden coronary problems is likely to manifest those problems in stress situations where he must exert a good deal of physical force. (N.T. 2:190 (6/13/83)).

26. The cost to test an officer's strength, skill, agility and visual acuity, and to perform blood tests, and stress, or cardiovascular tests, would be in the area of $600.00 per person tested. (N.T. 2:198 (6/13/83); 7:91 (6/13/83)).

27. The typical test for determining strength is the one repetition maximum

method. In this test, strength is determined by the amount of weight an individual can lift one time and one time only. This test, however could be costly and dangerous, because the individual is asked to exert maximum force. Exerting maximum force results in a dramatic increase in blood pressure. Therefore, screening for hypertension and poor cardiac function must be performed before administering the test. Anyone who has even mild hypertension or poor cardiac function should not take the one repetition maximum test. (N.T. 7:79–80 (6/13/83)).

28. The older a person becomes, the more dangerous it is to administer physical fitness tests to that person, because of the increased risk of silent heart disease as the person grows older. (N.T. 7:90 (6/13/83)).

29. Screening for poor cardiac function prior to administering a fitness test involves a physical examination, laboratory studies, resting electrocardiograms, and exercise electrocardiograms by a cardiologist. (N.T. 7:90 (6/13/83)).

30. After a thorough medical screening, a 60 year old could be given a strength test such as the one repetition maximum test, but it should be given in the presence of a physician. (N.T. 7:106 (/13/83)).

31. In order to accurately reflect the current physical condition of a person over 60 and his ability to perform the job of a police officer, he should be screened and tested at least annually. (N.T. 7:106 (6/13/83)).

32. The test battery given to members of the State Police in September and October of 1983 cannot be used to prove the proposition that substantially all officers nearing the age of retirement cannot perform the job of a state police officer.

33. Although the officers were told to do their best on the test battery, they were also told not to over-exert themselves and to proceed at their own pace. (N.T. 1:22–23 (11/7/83); 2:70–71 (11/7/83)).

34. The officers were told that no pre-established standards existed and that there was no such thing as "passing" or "failing" the tests. (Binker exhibits 10 and 12; N.T. 2:81–82 (11/7/83)).

35. After the test was administered, the Commonwealth did apply passing and failing standards, including time limitations.

36. If the officers participating in the test had known that there were standards and time limitations that would be applied, and if they had known that the results were to be used in this mandatory retirement litigation, they would have put forth a greater effort to do better and to achieve the "passing" scores. (N.T. 4:60–61 (11/7/83)).

37. Because of the cautionary disincentives to performance at full capacity, and because of the questionable practice of not informing the officers of the existence of pass-fail standards, the results of the test battery themselves are questionable and cannot be used to prove the validity of the age 60 mandatory retirement provisions.

## III. DISCUSSION

### A. *Qualifications Reasonably Necessary to the Essence of the State Police Business.*

The first prong of the test for a bona fide occupational qualification as enunciated in *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224 (5th Cir.1976), and as adopted by the Supreme Court in *Western Airlines v. Criswell,* 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985), requires that the employer prove the existence of a job qualification "reasonably necessary to the essence of [its] business." *Criswell,* —— U.S. at ——, 105 S.Ct. at 2751, 86 L.Ed.2d at 333. We hold that the Commonwealth in this case has met its burden of proof.

From the findings of fact detailed above at II–B, it should be obvious that the job of State Police Trooper can be very strenuous. The sole purpose of the State Police is to protect the safety and well being of the citizens of the Commonwealth. The essence of the State Police business is, therefore, safety. Safe and effective performance of some of the most critical tasks of a state police officer requires that the officer

be physically strong and agile, and that he be in good health and unlikely to collapse under physical or emotional stress. Some of these most critical tasks include the safe and effective handling of firearms, pursuit and capture by automobile or on foot of criminal suspects, and prompt assistance of accident victims. Undisputed testimony by the Commonwealth's experts, and testimony by State Police officers themselves, establishes that these critical tasks demand high degrees of strength, agility, endurance and coordination.[3]

The plaintiffs in this case have argued that, although some tasks do require high levels of strength, agility, endurance, and coordination, these tasks are not performed frequently, or even by all officers, and that they should not, therefore, set the physical performance standard for all officers. We find this argument to be of no importance to our inquiry. Tasks demanding high levels of physical performance may not be performed frequently, but the ability to perform these tasks is what renders the Pennsylvania State Police effective in protecting the safety of the citizens of this Commonwealth. Without the ability of all officers to meet the occasional, unexpected need for accuracy in handling firearms; for speed, strength, endurance, and agility in pursuing and subduing criminal suspects; and for strength, skill, and speed in rescuing accident victims, the safety of the public would be needlessly endangered. We therefore hold that good health, physical fitness, strength, and dexterity are job qualifications reasonably necessary to the essence and safety of the State Police business.

The plaintiffs in this case argue against this holding on the ground that the Pennsylvania State Police organization makes no attempt to monitor the health and physi-

cal fitness of its younger members and permits some to remain on the job with serious disabilities. The absence of a physical fitness or monitoring program within an organization is certainly evidence that physical fitness is not a reasonably necessary job qualification, *see Heiar v. Crawford County*, 746 F.2d 1190, 1198 (7th Cir. 1984), but that is all it is—evidence. *See also, Equal Employment Opportunity Commission v. City of East Providence*, 798 F.2d 524, 530 (1st Cir.1986), ("a police force's failure continuously to monitor physical standards does not, standing alone, compel a finding that physical fitness is not a reasonably necessary job qualification").

In the case before us, the State Police have, and have had since at least 1974, some form of health and physical fitness monitoring. Although it is true that periodic physical fitness testing has not been a part of this program in the past, the State Police have made regular weight and medical deficiency checks of the membership, and have required diagnosis and treatment by physicians for those members with conditions that threaten their ability to perform the job. Members who are unable to perform the full duties of a trooper because of a medical deficiency are placed on a temporary limited duty status. These officers must seek treatment for their problems and are required to submit to their superiors quarterly medical reports indicating their diagnosis, prognosis, and course of treatment. More recently, the State Police have begun an expanded health and physical fitness training program that involves quarterly physical fitness assessments and mandatory fitness standards.

---

**3.** The specific tasks that require high levels of physical performance and psychomotor capacity are outlined in the testimony of and a study performed by David J. Wagner, the Commonwealth's industrial psychologist. Further analysis of these tasks is provided by Dr. Albert Paolone, and Dr. Richard A. Berger, exercise physiologists who worked with Mr. Wagner in performing the study. The EEOC strongly criticized Wagner's study, arguing that it was devel-

oped under a consent decree from a case involving the hiring and promotion of minorities and not involving age. We find the study to be thorough and valid to the extent it made a detailed analysis of the tasks performed by each rank of police officers, and find that the nature of a state police officer's job does not change when it is being scrutinized in an age discrimination case rather than a race discrimination case.

These health and fitness programs, while fairly limited at the time this action was instituted in 1983, indicate that the Commonwealth and the State Police organization are concerned about the physical abilities of the State Police officers to do their jobs. Far from proving that health and fitness are not reasonably necessary to the essence of the State Police business, they demonstrate the increasing awareness of the importance of these qualifications to the effective accomplishment of the goals and purpose of the Pennsylvania State Police and the increasing commitment of the State Police to maintaining the good health and fitness of its members.

It is conceded that a few of the younger members on the force do suffer from serious physical disabilities, but the existence of these few members suffering from such disabilities does not outweigh the evidence from the experts' job analysis and the testimony of troopers themselves that good health, physical strength, endurance, and dexterity are necessary to effectively protect the public's safety and well being. This is especially true where the State Police are already implementing a program of regular physical assessments and mandatory fitness standards.[4]

In light of all the evidence, therefore, we conclude that good health, physical strength, endurance, and dexterity are job qualifications reasonably necessary to the essence of the State Police business.

### B. *Necessity of Age as a Proxy for Individual Evaluation.*

The second prong of the BFOQ test requires the employer to prove that it is "compelled to rely on age as a proxy for the safety-related job qualifications validated in the first inquiry." *Criswell,* 472 U.S. at ——, 105 S.Ct. at 2751, 86 L.Ed.2d at 333. This second prong may be satisfied either by a showing that the employer has "reasonable cause, that is, a factual basis, for believing that all or substantially all persons [above the mandatory retirement age] would be unable to perform safely and efficiently the duties of the job involved," *id.,* 472 U.S. at ——, 105 S.Ct. at 2751–52, 86 L.Ed.2d at 333–34, *or* by a showing that it is " 'impossible or impractical' to make individualized determinations of the capabilities of persons in the excluded group." *E.E.O.C. v. Commonwealth of Pennsylvania,* 768 F.2d at 517, *quoting, Criswell,* 472 U.S. at ——, 105 S.Ct. at 2752, 86 L.Ed.2d at 334.

In this case, we find that the Commonwealth has met its burden of proving that it is compelled to rely on age as a proxy for individual determinations. In the first place, we believe that the Commonwealth has conclusively proved that substantially all (86%) of the State Police Officers, once they near or reach the age of 60, have a moderately high risk or higher of developing cardiovascular disease. Absence of cardiovascular disease is a reasonably necessary job qualification because an officer with hidden coronary problems is most likely to manifest those problems in stress situations. We have already noted that the purpose of the State Police organization is to protect the safety and well-being of the citizens of Pennsylvania. The ability of an older officer to serve this purpose is great-

---

**4.** The EEOC urges us to completely ignore all recent and prospective efforts of the Pennsylvania State Police to monitor and improve the physical capabilities of the members of the force on the grounds that we should be focusing only on the conditions and programs as they existed before this suit was filed. We decline to ignore evidence of recent efforts, however, because we find them to be relevant to the question of whether physical fitness is and was a reasonably necessary job qualification. It must be noted that the job of a State Police officer does not appear to have changed or become more demanding since institution of this suit or the institution of a more comprehensive physi-

cal assessment program. The institution of the newer programs, therefore, is indicative of the physical demands of the job as it has been all along. We note too that other courts have considered this type of evidence in evaluating the BFOQ claims of other State Police forces. *See, e.g., Equal Employment Opportunity Commission v. State of New Jersey,* 631 F.Supp. 1506, 1508–1509 (D.N.J.1986) (the recent implementation of a Well Trooper Program and mandatory physical fitness standards are evidence that the health and fitness of New Jersey State Police Officers is essential to the safe and efficient performance of their law enforcement duties).

ly reduced when there is a high probability that he has a cardiovascular disease. The State Police cannot afford to retain officers who are likely to suffer attacks when placed under stress in an emergency situation.

Additionally, plaintiffs' own expert, Dr. Mostardi, in his report of a project he undertook for the Akron, Ohio police department, recommends against employing anyone with a moderately high or higher risk of cardiovascular disease. This high risk of developing cardiovascular disease, along with the decrease of an officer's capacities in the various physical and psychomotor dimensions as he approaches and passes age 60, leads us to conclude that all or substantially all officers over the age of 60 would be unable to perform safely and efficiently the duties of a State Police Officer.

Even if the fact that 86% of officers nearing the age of 60 have a high risk of developing cardiovascular disease were insufficient to demonstrate that the State Police appropriately rely on age as a proxy for individual evaluation, this fact, along with others, supports our alternative holding that it is highly impractical, if not impossible, to make individualized determinations of the capabilities of 60 year old police officers.

Expert testimony given by both plaintiffs' and defendants' experts demonstrates that as a person grows older, his ability to perform physical and psychomotor functions decreases, while the chance that he will develop disabling cardiovascular problems increases (*see* findings of fact, above). Although these facts, by themselves, may be insufficient to justify age as a BFOQ, they do justify questioning the ability of older officers to perform the critical tasks of a state police officer. Unfortunately, individual testing of older police officers is highly impractical and nearly impossible.

The typical test for determining body strength, one of the job qualifications validated in III–A above, is the one Repetition Maximum method. In this test, strength is determined by the amount of weight an individual can lift one time and one time

only. This test is performed using different lifting apparatus and different muscle groups to determine the strength of various parts of the body. The test, however, is dangerous to administer to older officers who have a high probability of having or developing cardiovascular problems, because the individual is asked to exert maximum force. Exerting maximum force results in a dramatic increase in blood pressure. Screening for hypertension and poor cardiac function must be performed before administering this test, and anyone who has even mild hypertension or poor cardiac function *cannot* be tested.

Screening for poor cardiac function prior to administering a fitness test involves a physical examination by a physician, laboratory studies, resting electrocardiograms, and exercise electrocardiograms by a cardiologist. Only after this type of thorough medical screening could a 60 year old who shows *no* signs of even mild hypertension or poor cardiac function be given a strength test such as the one repetition maximum test, and then only in the presence of a physician.

In order to accurately reflect the physical condition of a person over 60, and his ability to perform the job of a State Police Officer, medical screening and physical testing should be performed at least annually. The older the individual becomes, the riskier it is to administer the test because of the increased risk of silent heart disease, and the danger that physical performance testing will precipitate an attack. Further, the cost of performing annual medical screening and physical testing is prohibitive. For each officer, the cost to test strength, skill, agility, and visual acuity, and to perform blood tests and stress, or cardiovascular tests would be in the area of $600.00. If any abnormality were detected during the medical screening, the cost would sky-rocket, as more advanced tests would be needed.

In sum, even if a 60 year old could be tested for the qualifications of physical strength and endurance, i.e., even if he passed the stringent medical screening, the

cost of the test on an annual basis renders testing individuals above the age of 60 for their ability to perform the duties of a state police officer highly impractical. Further, while we recognize that many tests can be done to discover many physical capabilities and diseases, we do not believe testing is practical or economically feasible in the present case. We agree with defendants' expert, Dr. Paolone, that testing cannot safely measure all dimensions in everyone. Annual testing would place an unreasonable administrative *and* financial burden upon the Pennsylvania State Police force. We therefore hold that mandatory retirement at age 60 is a necessary proxy for the safety-related job qualifications of good health, strength, endurance, agility, and dexterity.

## IV. CONCLUSIONS OF LAW

We conclude that the Commonwealth of Pennsylvania and the Pennsylvania State Police have met their burden of proof that the mandatory retirement age of sixty for Pennsylvania State Police Officers is a bona fide occupational qualification. Accordingly, the mandatory retirement statute, 71 P.S. § 65(d), is valid and is not in violation of the federal Age Discrimination in Employment Act.[5]

## ORDER

AND NOW, this 22nd day of October, 1986, in accordance with the accompanying Memorandum, IT IS HEREBY ORDERED and declared that:

1. The Pennsylvania mandatory retirement statute for State Police officers, 71 P.S. § 65(d) is not in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634; nor does the statute violate the Due Process or Equal Protection Clauses of the United States Constitution.

2. Plaintiffs' motion for a permanent injunction against Defendants to restrain the involuntary retirement of Pennsylvania State Police officers who reach the age of sixty is denied.

5. We also reiterate our prior holding that the compulsory retirement statute does not violate

the Equal Protection and Due Process clauses of the Constitution.